UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
FACEBOOK USER ID AMY WELLS (AMY
BEARDEN) AND WENDEL FRIESEN
THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.

Case No. 1:19-mj-066

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

I, Brandon Dennis, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure, and made in support of 18 U.S.C. §§ 2703 (a), 2703 (b)(1)(a), 2703

(c)(1)(a) for a search warrant for information associated with certain Facebook User ID's that are

stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a

social networking company headquartered in Menlo Park, California. The information to search

and seize is described in the following paragraphs and in (more particularly described below in

in Attachment A and Attachment B, incorporated herein).

2.      I am a duly sworn Special Agent (SA) of the United States Drug Enforcement

Administration (DEA) and have been assigned as such since 2018.  In that capacity, I am

authorized to apply for a warrant under Rule 41 of the Federal Rules of Criminal Procedure.

3.      I am currently assigned to the Bismarck (POD) and have been since April 2018.

My current duty assignment includes, but is not limited to, investigating complex drug

conspiracies and organizations and individuals involved in the possession of and trafficking in controlled substances. Prior to my current assignment with the DEA, I was employed as a Detective and Patrolman for the Nicholasville Police Department in Nicholasville, Kentucky for a period of six years. Through my training, education, and experience, I have become familiar with the manner in which persons involved in the trafficking of controlled substances and their methods of operation and attempts to avoid detection from law enforcement. I am authorized and have the responsibility to investigate and arrest persons for violations of federal law, involving the unlawful distribution of drugs, (21 U.S.C. § 841(a)(1)), attempt and conspiracy to commit the same (21 U.S.C. § 846), money laundering (18 U.S.C. § 1956 and 1957), and illegal possession of firearms (18 U.S.C. § 922 and 18 U.S.C. § 924(c)(1)).

4.      During my tenure with DEA and in local law enforcement, I have participated in numerous investigations involving violations of federal narcotics laws. I have attended schools and have been instructed in many aspects of narcotics investigations and am familiar with the narcotic laws promulgated under Title 21 of the United States Code and had classes on federal money laundering laws promulgated under Title 18 of the United States Code. I am aware of the following information from numerous sources, including but not limited to my own personal observations and participation in this investigation and my review and analysis of oral and written reports. I have initiated and/or participated in surveillance, the operation and debriefing of numerous drug dealers, drug users, and informants, performed both physical and electronic surveillance, and executed search warrants. Further, I have analyzed records documenting the purchase and distribution of illegal drugs, and the concealment of illegal narcotics profits.

5.      I know, based on my knowledge, training, experience, and participation in other investigations, and consultations with other experienced investigators including DEA Special

Agent Jeff Buckles, that drug traffickers commonly use social media to aid them in their drug trafficking activities, and conceal conversations from their cellular telephones.

6.      This affidavit is based on my personal knowledge and involvement in the investigation, and from information I have received from other persons involved in the investigation, including but not limited to the State of North Dakota Office of the Attorney General Bureau of Criminal Investigation (BCI) Special Agent Craig Zachmeier, Bureau of Indian Affairs (BIA) Special Agent Kevin Lau and Metro Area Narcotics Task Force (MANTF) Officer Jeremy Curtis.

7.      The information contained in this affidavit is not a complete account of everything known to me about this case. Rather, it contains the facts that I believe are sufficient to support a finding of probable cause to support the requested search warrant.

## PROBABLE CAUSE

8.      On July 30, 2018, a criminal informant from Belcourt, ND (Rolette County) informed Bureau of Indian Affairs Special Agent (S/A) Kevin Lau that there was a man in Rugby, ND (Pierce County) whom was delivering large quantities of methamphetamine to the Turtle Mountain Indian Reservation.

10.     Special Agent Lau began checking Money Grams and learned the following: On May 13, 2018, Todd Bergeron, utilizing address 205 North Main Avenue in Rugby, ND and mobile phone number 701-681-1907 sent three hundred dollars ($300.00) by money gram from Walmart, 3900 South Broadway, Minot, ND, to Amy Wells, 3822 West Ocotillo Road, Phoenix, Arizona. Todd Bergeron presented an Arizona operators license when sending the money gram and Amy Wells presented an Arizona operators license when retrieving the money gram. Amy

Wells provided mobile phone number 480-653-7201 when retrieving the money gram at Speedy
Cash, 1841 West Northern Avenue, Phoenix, Arizona.

11.     On May 18, 2018, Todd Bergeron, utilizing address 205 North Main Avenue in
Rugby, ND and mobile phone number 701-681-1907 sent two-thousand four hundred dollars
($2,400.00) by money gram from Walmart, 3900 South Broadway, Minot, ND, to Amy Wells,
115 East Brown Street, Phoenix, Arizona. Todd Bergeron presented an Arizona drivers license
when sending the money gram and Amy Wells presented an Arizona drivers license when
retrieving the money gram. Amy Wells provided mobile phone number 480-653-7201 when
retrieving the money gram at Walmart, 9600 North Metro Parkway West Avenue, Phoenix,
Arizona.

12.     On May 23, 2018, Todd Bergeron, utilizing address 205 North Main Avenue in
Rugby, ND and mobile phone number 701-681-1907 sent two hundred dollars ($200.00) by
money gram from Walmart, 912 11 Street East, Bottineau, ND, to Amy Wells, 115 East Brown
Street, Phoenix, Arizona. Todd Bergeron presented an Arizona drivers license when sending the
money gram and Amy Wells presented an Arizona drivers license when retrieving the money
gram.  Amy Wells provided mobile phone number 480-653-7201 when retrieving the money
gram at  Walmart, 5010 North 95th Avenue, Glendale, Arizona.

13.     On May 29, 2018, Michelle Waldbillig, utilizing address 1305 31st Street
Southeast, Minot, ND (Ward County) and mobile phone number 701-540-7121, sent four-
thousand five-hundred dollars ($4,500.00) by money gram from Walmart, 3900 South
Broadway, Minot, ND, to Todd Bergeron, 8809 West Greer Avenue, Peoria, Arizona. Michelle
Waldbillig presented a North Dakota driver's license when sending the money gram and Todd
Bergeron presented an Arizona driver's license when retrieving the money gram. Todd Bergeron

provided mobile phone number 701-681-1907 when retrieving the money gram at Walmart, 9600 North Metro Parkway West Avenue, Phoenix, Arizona. (Please note that this is the same Walmart in Phoenix, Arizona where Amy Wells retrieved the money order sent on May 18, 2018.)

14.     When checking police records it was discovered that on May 21, 2018, Rugby Police Officer Jeremy Monroe had responded to 205 North Main Avenue, Rugby, North Dakota on a complaint of Theft of Property and Forgery. Jeremy Monroe identified Todd Bergeron as the complainant and victim. Todd Bergeron provided his address as 205 North Main Avenue, Rugby, ND and phone number as 701-681-1907.

15.     On the afternoon of August 9, 2018, while on routine patrol, Pierce County Sheriff's Department Deputy Anthony Russell observed April Houle's 1999 Oldsmobile Alero parked at 205 North Main Avenue, Rugby, ND.

16.     On August 15, 2018, April Houle's probation officer, Jaci Williams, met with April Houle. Officer Williams asked April Houle about being at 205 North Main Avenue, Rugby, ND. April Houle admitted to being at the residence, claimed she did not know the man, and was at the residence as the man wanted to buy April Houle's vehicles, but April Houle was not going to sell them.

17.     On Sunday evening, August 19, 2018, while on routine patrol, Rugby Police Officer Dayton Denning observed a red Mitsubishi 3000 GT parked in the driveway of 205 North Main Avenue, Rugby, ND with no license plates. At approximately 8:09 pm, Officer Denning observed the red Mitsubishi on US Highway #2 leaving Rugby, ND west bound towards Minot, ND. Officer Denning initiated a traffic stop on the vehicle.

18.     The driver of the vehicle was identified as Bryan Loran from Minot, ND. Officer Denning observed a temporary registration in the window of the red Mitsubishi 3000 GT that was printed off the internet in the name of A. Houle. (Officer S. Bommersbach was aware that A. Houle was April Houle as Rugby Police Officer S. Bommersbach had observed April Houle operating this vehicle in the past in the Rugby, ND area.) Officer Denning asked Bryan Loran about the background on the red Mitsubishi 3000 GT which Bryan Loran was unable to provide, including who A. Houle was.

19.     Officer Denning asked Bryan Loran about contraband or anything illegal on Bryan Loran's person or in the vehicle. Bryan Loran advised that he had ten thousand dollars ($10,000) cash in his wallet to buy a tow truck. Officer Denning advised Bryan Loran that Officer Denning would be impounding the red Mitsubishi 3000 GT as Bryan Loran knew nothing about the vehicle. Bryan Loran agreed with leaving the red Mitsubishi 3000 GT and entered a vehicle that had stopped at the traffic stop which had been following Bryan Loran when Bryan Loran was driving the red Mitsubishi 3000 GT.

20.     During the early morning hours of April 22, 2018, Rugby Police Officer Scott Bommersbach and Pierce County Deputy Sheriff Russell Anthony seized multiple bags of garbage from the curb in front of 205 North Main Avenue, Rugby, ND, the Todd Bergeron residence. Subsequently seized from the garbage was:

21.     A.     Multiple pieces of documentation in the name of Todd Bergeron and the address of 205 North Main Avenue, Rugby, ND;

22.     B.     Two (2) cellophane wraps with "2500" written and "7500" written with a blue marker (indicating currency);

23.     C.      Cellophane wrap in the size and shape as being wrapped around a large amount of US currency;

24.     D.      A Fed Ex box sent from Phoenix, Arizona to Todd Bergeron at 205 Main Avenue, Rugby, ND;

25.     E.      A Fed Ex Box with the label removed containing multiple heat sealed freezer bags containing methamphetamine residue with the residue being of a measurable amount (which field tested positive for methamphetamine);

26.     F.      A US Postal Service padded envelope sent from Phoenix, Arizona to Todd Bergeron at 205 Main Avenue, Rugby, ND;

27.     G.      An intact methamphetamine smoking device with residue;

28.     H.      A piece of tin foil used to ingest methamphetamine with burn marks;

29.     I.      Multiple money gram receipts sent to multiple persons in Arizona, including Amy Wells, totaling in excess of nineteen thousand dollars ($19,000) sent between May 18, 2018 and July 25, 2018 (a money gram was sent on July 4, 2018 by Carla Bercier in the amount of two thousand five hundred dollars ($2,500), a small piece of yellow paper with the name Wendel Friesen with the telephone number 623-204-4425.

30.     J.      Multiple used hypodermic needles (one with blood and no evidence of a medical condition explaining the hypodermic needles);

31.     K.      Black shoulder Holster for a handgun;

32.     L.      .223 caliber live rifle cartridge.

33.     On October 17, 2018, at approximately 1:30 pm, S/A Zachmeier and Pierce County Sheriff Josh Siegler conducted a videotaped interview with April Houle at the Pierce County Law Enforcement Center. April Houle was incarcerated at the Pierce County Law

Enforcement Center for a probation violation for ingesting methamphetamine and was incarcerated since October 10, 2018.

34.     April Houle advised that at the end of August to the beginning of September 2018 she was at the Todd Bergeron residence in Rugby, ND. April Houle advised that she met Todd Bergeron through Claudia Hall from Rugby, ND and that Claudia Hall was getting methamphetamine from Todd Bergeron. April Houle stated that Todd Bergeron placed an ounce of methamphetamine in front of her and left to see if April Houle would take it. April Houle stated the methamphetamine was from Todd Bergeron, though Todd Bergeron provided her a hypodermic needle with methamphetamine and that April Houle injected the methamphetamine given to her by Todd Bergeron. April Houle stated that Todd Bergeron also injected methamphetamine into himself at his house with April Houle.

35.     April Houle stated that Todd Bergeron's girlfriend was Carla Bercier who resided in Dunseith East Housing. April Houle stated that Carla Bercier was April Houle's friend. April Houle stated that Todd Bergeron supplied Carla Bercier with methamphetamine for Carla Bercier to distribute on the Turtle Mountain Indian Reservation for Todd Bergeron. April Houle advised that she had received methamphetamine multiple times from Carla Bercier and that the methamphetamine April Houle ingested leading to April Houle's arrest on October 10, 2018, was from Carla Bercier. April Houle advised that she got the methamphetamine from Carla Bercier in Rolette County, on tribal land. (Please note that April Houle is not an enrolled member of the Turtle Mountain Tribe.)

36.     April Houle advised that Todd Bergeron had sellers on the Turtle Mountain Indian Reservation and that his main seller was Cody LNU (last name unknown). April Houle described that Cody LNU drove a red Chevrolet Monte Carlo, and had been arrested in Belcourt

for a pit bull dog biting. S/A Zachmeier checked with Turtle Mountain Bureau of Indian Affairs Police Officer Michael Slator. Cody LNU was identified as Cody Delong.

37.     April Houle advised that Todd Bergeron gets his narcotics from Arizona from his ex-wife named "Amy." April Houle then advised that it was either Arizona or Arkansas but the methamphetamine does come from his ex-wife "Amy." April Houle stated that she saw "Amy" at Todd Bergeron's house in Rugby in September and that "Amy" "had a little dog, "Amy" was white, had blond hair, and was really skinny." (Please note that S/A Zachmeier is aware that the physical description provided by April Houle matches the physical description of Amy Wells on Facebook and that Amy Wells was the person who received multiple money grams from North Dakota, with receipts located in Todd Bergeron's garbage being sent by Todd Bergeron and Carla Bercier.)

38.     April Houle stated that Todd Bergeron had made multiple trips to Arizona to retrieve methamphetamine for distribution in North Dakota. April Hole advised that Todd Bergeron always droves a different vehicle on the narcotics trips. April Houle described Todd Bergeron as currently being the main supplier of methamphetamine in the Turtle Mountain and Minot areas. April Houle described that Todd Bergeron kept Carla Bercier high and that Carla Bercier kept April Houle high.

39.     On October 27, 2018, at approximately 12:50 pm, Rolette County Sheriff's Deputy Ervin Charette was patrolling Highway 3 by 85th St (in Rolette County) when Deputy Charette spotted a greenish/blue Chevy Suburban heading South bound with no front license plate. Deputy Charette turned around and caught up to the vehicle. Deputy Charette followed the vehicle and the vehicle gradually pulled right and the tires touched the fog line and the vehicle corrected and pulled back into the lane. The vehicle continued south bound and again

the vehicle gradually pulled right and the tires touched the fog line and drove on the fog line for a distance. Deputy Charette initiated a traffic stop on the vehicle. The rear license plate on the suburban was Turtle Mountain Plate AAI 423.

40.     Deputy Charette approached the driver's side of the vehicle and informed the male driver the reason for the traffic stop. Deputy Charette asked the male driver for his license, registration and insurance. The male driver stated that he did not know where the registration or insurance information was. Deputy Charette asked him if that information was in the glove box and he stated that he just looked and it was not in there.

41.     Deputy Charette asked him if that information could be anywhere else and he said he did not know. Deputy Charette asked the male driver if the vehicle was his and he said no. Deputy Charette asked the male driver who it belong to and he said a friend. Deputy Charette asked the male driver what he was doing with the vehicle and he stated that he borrowed the vehicle to go retrieve a trailer. Deputy Charette asked the male where his vehicle was and he said at the casino (Sky Dancer Casino). Deputy Charette asked the male driver why he didn't use his vehicle and he said he had a car and can't tow a trailer. The driver provided a North Dakota driver's license and the driver was identified as Todd Bergeron from Rugby, ND.

42.     Deputy Charette checked the vehicle license plate on Turtle Mountain plate AAI. Deputy Charette learned the tribal plates came back to a K1500 truck registered to Mike Poitra from Belcourt, ND. This indicated that the vehicle Todd Bergeron was operating displayed fictitious plates.

43.     Deputy Charette went back and spoke with the driver, Todd Bergeron, and informed Todd Bergeron about the license plate on the vehicle. Deputy Charette asked Todd Bergeron, who the vehicle belonged to and Todd Bergeron stated his friend. Deputy Charette

asked Todd Bergeron what his friend's name was and Todd Bergeron gave the name David

Vance.  Deputy Charette asked Todd Bergeron again the name of the owner of the vehicle and

Todd Bergeron stated David Vance.  Deputy Charette explained to Todd Bergeron the situation

with the license plate and that since he was driving and in physical control of the vehicle that

Todd Bergeron could be arrested for having the wrong plates.  Todd Bergeron stated that he was

calling David Vance to see if David Vance could bring the registration and insurance information

to the scene.

44.    Deputy Charette checked the vehicle VIN# 1GNFK16K7NJ347840.  Deputy

Charette learned the VIN came back registered to a 1992 dark blue Chevy Suburban registered to

Jeffrey Foss from Bottineau, ND.

45.    Deputy Ann Millerbrand arrived to assist. Deputy Millerbrand informed Todd

Bergeron of his Miranda Warning and Todd Bergeron agreed to speak with officers.  Deputy

Charette asked Todd Bergeron if David's last name was Vance or Grant and Todd Bergeron

stated Grant. Todd Bergeron allegedly called David Grant and informed David Grant of the

situation with the vehicle and David Grant told Todd Bergeron that David Grant would come to

the scene and provide the paper work for the vehicle.

46.    While waiting for David Grant, Deputy Charette contacted United States Border

Patrol Agent Travis Ramsey to conduct an exterior K-9 search of the suburban. The K-9 did not

indicate the presence of narcotics in the suburban.

47.    After approximately thirty (30) to forty (40) minutes David Grant did not show up

to the scene with the paper work for the vehicle.

48.    After it was determined that it appeared that David Grant was not coming to the

scene, Deputy Charette placed Todd Bergeron under arrest for Unlawful use of a License Plate or

Tab and issued Todd Bergeron a citation for driving with No Liability Insurance since he was driving the vehicle and was in physical control. Deputy Charette requested Deputy Millerbrand transport Todd Bergeron to the Rolette County jail. Deputy Charette informed Todd Bergeron that Deputy Charette would be having the vehicle towed and that a vehicle tow inventory would be done. Todd Bergeron advised Deputy Millerbrand that there was ten-thousand dollars ($10,000.00) cash in the center divider.

49.     Todd Bergeron told Deputy Millerbrand that his girlfriend's name was "Amber" and Todd Bergeron claimed he did not know Amber's last name. Todd Bergeron advised that Amber was staying in room #305 at the Sky Dancer Hotel. During the transport, Todd Bergeron's cellular telephone rang. Todd Bergeron told Deputy Millerbrand that it was a Carla that lived in Rugby and Carla was upset with Todd Bergeron for not stopping to see her. Todd Bergeron advised that he had just returned from Arizona and did not want to see Carla, so he traveled to the Sky Dancer Casino and got a room in the hotel.

50.     Todd Bergeron's vehicle was towed to the Rolette County Sheriff's Department to be placed in a secured building. Deputy Charette conducted an impound-inventory search of the vehicle. Deputy Charette did locate a large amount of cash in the center divider and two black wallets. Deputy Charette observed one (1) of the black wallets with silver in color chain and an additional amount of cash. In the second black wallet was a clear plastic bag with powder residue and multiple syringe needles. Deputy Charette contacted S/A Zachmeier and advised S/A Zachmeier of the vehicle stop and discovery. S/A Zachmeier directed Deputy Charette to suspend the inventory search pending the application of a search warrant for Todd Bergeron's vehicle.

51.     S/A Zachmeier contacted BIA S/A Kevin Lau with the above information. S/A Kevin Lau advised that on the morning of October 27, 2018, Todd Bergeron checked into a hotel room at the Sky Dancer Hotel with David Grant. The hotel room was #305. Sky Dancer security observed both David Grant and Todd Bergeron at the casino. Sky Dancer security observed Todd Bergeron provide a bag to David Grant. S/A Lau learned from Sky Dancer security that Todd Bergeron paid for the room and that David Grant took the rewards points. S/A Kevin Lau obtained from the Sky Dancer Casino a photograph of Todd Bergeron getting into the suburban at the Casino carrying a bag, which would have occurred prior to the traffic stop by Deputy Charette.

52.     S/A Lau advised that Todd Bergeron arrived at the Sky Dancer Casino during the early morning hours of October 27, 2018 driving a white Cadillac bearing Arizona license #CKF9207. The vehicle was registered to Todd Bergeron, Prescott Valley, AZ and was registered in Arizona on October 24, 2018. S/A Lau advised that that Todd Bergeron arrived at the hotel in the Cadillac with a female.

53.     S/A Lau learned from Sky Dancer Casino that Todd Bergeron removed bags form both the rear of the Cadillac with Arizona plate (CKF9207) and from the passenger's compartment of the Cadillac with Arizona license plate into the 1992 Suburban later stopped by Deputy Charette. After Todd Bergeron left the area of the Cadillac in the 1992 Suburban, David Grant returned to the Cadillac with Arizona license plates, entered the passenger's compartment and appeared to be looking for something. (This is recorded on surveillance video from the Sky Dancer Casino).

54.     S/A Lau learned that since January 20, 2018, David Grant had put over three hundred thousand dollars ($300,000) into gambling machines at the casino and left with

approximately two-hundred seventy six thousand dollars ($276,000). S/A Lau learned that since June 2018, Todd Bergeron and David Grant had checked into the hotel, with both their names on the account a minimum of five (5) times. S/A Lau further investigated the background of David Grant and had been unable to locate and employer or employee history for David Grant and it is believed that David Grant is unemployed.

55.     Todd Bergeron is not an enrolled member of the Turtle Mountain Indian Tribe. David Grant is an enrolled member of the Turtle Mountain Indian Tribe.

56.     On October 27, 2018, at approximately 9:30 pm, Todd Bergeron bonded out of the Rolette County jail for five hundred dollars ($500) cash. David Grant was in the vehicle that arrived to the Rolette County jail where Cheryl Lilley posted Todd Bergeron's bond, and which Todd Bergeron left the jail with David Grant and Cheryl Lilley.

57.     On October 27, 2018, at 9:48 pm, S/A Zachmeier obtained a night time search warrant for Todd Bergeron's Rugby residence, 205 North Main Avenue, Todd Bergeron's hotel room, room #305 at the Sky Dancer hotel, Todd Bergeron's person, and the 1992 Chevrolet suburban Todd Bergeron was operating when stopped earlier by Deputy Charette. Bureau of Indian Affairs Police Officer Michael Slater also obtained a Turtle Mountain Tribal search warrant for room #305 at the Sky Dancer hotel.

58.     On October 27, 2018, at 9:58 pm, the Bureau of Indian Affairs executed the Tribal search warrant on room #305 at the Sky Dancer Casino. Located inside the room were Todd Bergeron and Amber Bassett, both non-enrolled members of the Turtle Mountain Indian Tribe. Located in the room were user amounts of methamphetamine, drug paraphernalia, and multiple electronic devices to include cellular phones and computers.

59.     On October 27, 2018, at approximately 10:20 pm, the search warrant was executed at Todd Bergeron's residence in Rugby, ND (205 N Main Ave, Rugby, ND) by Rugby Police Department, Pierce County Sheriff's Office, and other law enforcement. Seized was documentation in the name of Todd Bergeron, Amy Wells, and Claudia Hall, approximately one-half (1/2) pound of methamphetamine, hypodermic needles, scale, packaging materials, and electronics. There were multiple cameras set up throughout the inside of the residence which have recorded the occupants of the residence, their actions, and their movements. Also located inside of the residence was a silver Apple Mac Mini, a black Seagate external hard drive, an Apple TV storage device, and a blue Toshiba hard drive.

60.     On October 27, 2018, at approximately 10:35 pm, S/A Zachmeier served the North Dakota state search warrant, with a nighttime authorization on room #305 at the Sky Dancer Casino (3965 Sky Dancer Way NE, Belcourt, ND 58316). Todd Bergeron and Amber Bassett were arrested for possession of methamphetamine and possession of drug paraphernalia. During a subsequent interview with Amber Bassett, Amber Bassett admitted to ingesting methamphetamine in room #305 and that Todd Bergeron supplied her with the methamphetamine.

61.     On October 28, 2018, at approximately 12:30 am, S/A Zachmeier seized the 2004 white Cadillac bearing Arizona license #CKF9207, registered to Todd Bergeron at 11925 N Tevy Trail, Prescott Valley, AZ with VIN#1GYEE637540192356. This vehicle was towed and secured at the Belcourt Police Department parking lot, where it has remained since October 28th, 2018. The 2004 white Cadillac was searched by SA Dennis and S/A Zachmeier on 12-10-2018 with a search warrant issued by the Hon. Charles S. Miller on 12-05-2018. A result of the search was the discovery of a red Coleman Max backpack. The backpack contained one bag of

hypodermic needles and two small notebooks with handwriting, which looked to contain owe sheets based on my training and experience.

62.     On October 28, 2018, at approximately 3:00 am, Bureau of Indian Affairs Officer Michael Slater located and stopped the vehicle (a 1997 Chevrolet Suburban) for swerving which David Grant was present in when Todd Bergeron was bonded out of jail. The stop occurred within the boundaries of the Turtle Mountain Indian Reservation, near the Turtle Mountain Community College. David Grant was the driver. Subsequently seized from the vehicle was approximately three (3) ounces of methamphetamine packaged for resale, marijuana packaged for resale, hydrocodone pills packaged for resale, a locked personal use safe, and a handgun under the driver's seat. Officer Slater also took possession of David Grant's cell phone which at this time. David's cell phone was a black ZTE in a black Otter Box, which multiple cracks to the screen of the cell phone.

63.     On October 28, 2018, at approximately 5:00 am, BIA Police Officer Jared Morin arrested Carla Bercier at the Sky Dancer Casino for and outstanding Fargo Police municipal warrant for theft. Carla Bercier appeared under the influence of narcotics.

64.     On October 28, 2018, at approximately 11:30 am, S/A Zachmeier and Deputy Charette executed the search warrant on the 1992 Chevrolet Suburban operated by Todd Bergeron on October 27, 2018. Seized from the vehicle was documentation in the name of David Grant, Documentation in the name of Todd Bergeron, approximately one-half once of methamphetamine, hypodermic needles, and fourteen thousand four hundred fifteen dollars ($14,415) in cash.

65.     On October 28, 2018, at approximately 7:00 pm, S/A Zachmeier and BIA Officer Michael Slater conducted a videotaped interview with David Grant. S/A Zachmeier advised

David Grant of his Miranda rights which David Grant admitted he understood. David Grant advised that on October 27, 2018 while at the Casino, Todd Bergeron had just returned from Arizona driving the white Cadillac and provided David Grant with one (1) pound of methamphetamine. David Grant allowed Todd Bergeron to use his suburban and David Grant had the cash in the suburban (the 1992 suburban stopped by Deputy Charette) to pay Todd Bergeron for methamphetamine which David Grant had already sold.

66.     David Grant stated that he would pay Todd Bergeron three thousand five hundred dollars ($3,500) for a pound of methamphetamine and would provide Todd Bergeron with up to thirty thousand dollars ($30,000) at a time. David Grant advised that he was the main supplier of methamphetamine on the Turtle Mountain Indian Reservation and that he would distribute one (1) to two (2) pounds of methamphetamine per week since May, 2018. David Grant stated that he would receive methamphetamine from Todd Bergeron both in Rolette County and at Todd Bergeron's residence in Rugby.

67.     David Grant advised that Todd Bergeron was getting the methamphetamine from Arizona from his ex-wife, Amy Wells. David Grant knew that Todd Bergeron was getting five (5) to ten (10) pounds of methamphetamine every one (1) to two (2) weeks. David Grant advised that Todd Bergeron had a person in Minot supplying Minot and a person in New Town supplying the New Town area.

68.     David Grant advised that there was more methamphetamine in the safe seized from his vehicle the previous night. David Grant consented to BIA Officer Slater entering the safe and provided the combination. Inside the safe was a large quantity of methamphetamine and marijuana. David Grant advised that there was three-quarters (3/4) pound of methamphetamine and (6) six ounces of marijuana. David Grant advised that both the methamphetamine and

marijuana was form Todd Bergeron and were received from Todd Bergeron in the Sky Dancer Casino parking lot on October 27, 2018.

69.     David Grant stated that the five hundred dollars ($500) cash posted as Todd Bergeron's bond in Rolette County by Cheryl Lilley belonged to David Grant. David Grant admitted that the five hundred dollars ($500) were proceeds from drug sales.

70.     S/A Zachmeier told David Grant that officers were aware that David Grant was supplying methamphetamine to Cody Delong to distribute in the Kent Addition Government Housing located within the boundaries of the Turtle Mountain Indian Reservation. David Grant advised that he was the person that supplied the Kent Addition with methamphetamine.

71.     On October 29, 2018, BIA Police Officer Michael Slater reviewed jail phone calls made by David Grant. David Grant called his girlfriend, Rebecca Belgarde, and advised her that law enforcement knew about "Cody" and directed to tell "Cody" to lay low. (During the earlier interview with David Grant, the only "Cody" officers brought up was "Cody Delong".)

72.     On October 31, 2018, S/A Craig Zachmeier and Drug Enforcement Agency (DEA) S/A Brandon Dennis reviewed security video from October 27, 2018, from the Sky Dancer Casino. On October 27, 2018, at approximately 10:36 am, Sky Dancer Casino security observed and video recorded the 1992 Chevrolet Suburban, later occupied and stopped by Deputy Charette, being operated by Cody Delong into the Sky Dancer Casino parking lot and being followed into the parking lot by a 1997 Chevrolet Suburban driven by David Grant (the suburban stopped by BIA Officer Slater on the morning of October 28, 2018 with methamphetamine and marijuana packaged for distribution). Cody Delong parked and exited the 1992 Chevrolet Suburban and entered the 1997 Chevrolet Suburban driven by David Grant, and they then left the Sky Dancer Casino parking lot together. After this, Todd Bergeron entered the

1992 Chevrolet Suburban and left the Sky Dancer Casino parking lot, being stopped
approximately two (2) hours later by Deputy Charette.

73.     On October 31, 2018, BIA Officer Michael Slator obtained a Turtle Mountain
Tribal arrest warrant for Cody Delong for Conspiracy to Deliver methamphetamine.

74.     On October 31, 2018, S/A Zachmeier and DEA S/A Brandon Dennis conducted a
video taped interview with David Grant. S/A Zachmeier advised David Grant of his Miranda
rights which David Grant acknowledged he understood. David Grant admitted that he supplied
Cody Delong with methamphetamine for resale and that Cody Delong sold methamphetamine
for David Grant. David Grant advised that Cody Delong did not know Todd Bergeron, and that
was why David Grant told Rebecca Belgarde to tell Cody Delong to lay low.

75.     S/A Zachmeier asked David Grant about the bags Todd Bergeron had in Todd
Bergeron's custody observed on Sky Dancer Casino security video on October 27, 2018. S/A
Zachmeier specifically asked about a red back pack that Todd Bergeron had draped over his
shoulder at the hotel. David Grant advised that the backpack contained methamphetamine,
hypodermic needles, and money. S/A Zachmeier advised David Grant that law enforcement did
not recover the red backpack and asked David Grant where the backpack was located. David
Grant advised that he believed it was in the white Cadillac as David Grant went to the white
Cadillac after Todd Bergeron was arrested to retrieve bond money to bond Todd Bergeron out of
jail (on October 27, 2018).

76.     On October 31, 2018, S/A Zachmeier and DEA S/A Brandon Dennis conducted a
video taped interview with Carla Bercier. S/A Zachmeier advised Carla Bercier of her Miranda
rights which Carla Bercier acknowledged she understood. Carla Bercier advised that she was in a

boyfriend/girlfriend relationship with Todd Bergeron. Carla Bercier advised that her dating relationship ended with Todd Bergeron approximately two (2) months earlier.

77.     Carla Bercier advised that she stayed for "weeks" at a time at Todd Bergeron's residence. Carla Bercier advised that she saw Todd Bergeron with approximately three (3) pounds of methamphetamine one (1) time at Todd Bergeron's Rugby residence. Carla Bercier advised that she did receive methamphetamine multiple times from Todd Bergeron and also received money from Todd Bergeron to gamble with. Carla Bercier knew the David Grant was Todd Bergeron's main methamphetamine dealer.

78.     On 12-08-2018 SA Dennis and Metro Area Narcotics Task Force (MANTF) Officer Jeremy Curtis spoke with a Source of Information (SOI) who stated that he/she dealt methamphetamine at the direction of Todd Bergeron in the District of North Dakota. That SOI stated that Todd Bergeron would drop weight in methamphetamine to Amber Basset and David Grant. The SOI further stated that David Grant took the last trip to Arizona with Todd Bergeron in October to retrieve methamphetamine from sources located in Arizona. The SOI stated that he knew David Grant was selling on the Turtle Mountain Indian Reservation for Todd Bergeron.

79.     The SOI stated that the two sources in Arizona are Amy Wells and Wendel Friesen. The SOI identified the Facebook.com profile pages for each Amy Wells (Amy Bearden) and Wendel Friesen. SA Dennis was shown by the SOI the Facebook pages for both Amy Wells and Wendel Friesen, and took photographs of each Facebook profile page. The specific Facebook user ID's  and web address for Amy Wells (Amy Bearden) at https://facebook.com/amy.wells.12177276 and Wendel Friesen at https://facebook.com/wendelfriesen .

80.    The SOI stated that no telephone conversation ever occurs between the SOI and Amy Wells and Wendel Friesen. The SOI stated that all communication is done through Facebook Messenger and always has been. The SOI stated that both Facebook profile pictures match the physical appearance of the individuals that he knows as Amy Wells and Wendel Friesen.

81.    The SOI stated that he/she has made three trips to Arizona from North Dakota to purchase quantities of methamphetamine from both Amy Wells and Wendel Friesen, who were sources for Todd Bergeron. The SOI stated that all arrangements for the purchase of the methamphetamine was conducted through Facebook messenger. The SOI further stated that the last trip to Arizona to visit Amy Wells and Wendel Friesen for the purchase of methamphetamine was in October of 2018.

82.    On 12-19-2018 SA Brandon Dennis and DEA Special Agent Jeff Buckles met with the SOI at the Bismarck POD. The SOI stated that he/she has been in contact with both Amy Wells and Wendel Friesen regarding when the SOI is going to travel to Arizona and purchase a large quantity of methamphetamine from both Amy Wells and Wendel Friesen. The SOI provided Facebook messages between the SOI and Wendel Friesen, and Amy Wells. SA Dennis photographed those Facebook messages. The messages between the SOI and Wendel Friesen were speaking in "drug slang" based on statements made by the SOI and SA Dennis's training and experience. The "drug slang" was referring to a baby as a pound of methamphetamine in the Facebook messages.

83.    On 01-04-2019 SA Dennis again spoke with the SOI. The SOI stated that he/she has remained in constant contact with both Amy Wells and Wendel Friesen via their Facebook

messenger accounts in regards to a time frame when the SOI would be traveling to Arizona to purchase the methamphetamine.

84.     SA Dennis has also learned through speaking with S/A Kevin Lau that through his investigation he determined that Todd Bergeron sent Wendel Friesen a money transfer to Friesen in Arizona.

85.     The SOI has also had multiple Facebook video chats with Amy Wells on 02-04-2019 where the two individuals discussed Amy Wells bringing methamphetamine to the district of North Dakota from Arizona via an Amtrak from Phoenix, discussed Wendel, and Todd Bergeron.

86.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://facebook.com. Facebook allows it users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes the general public.

87.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process of thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

88.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group of network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, birthdays, and etc.

89.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook

90.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about there whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

91.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a

user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been delated, as well as all photos and videos uploaded by any user that have that user tagged in them.

92.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item ion the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history of the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

93.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

94.     Facebook has a "like" feature that allows users to give positive feedback or connection to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

95.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

96.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

97.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

98.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about the user's access of use of that application may appear on the user's profile page.

99.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

100.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

101.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicious. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used tor controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logos the Internet Protocol (IP) addresses from which users accesses their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (E.g., information indicating a plan to commit a

crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

102.    Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribes and their use of Facebook, such as account access information, transaction information, and other account information.

## REQUEST FOR SEALING

102.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

103.    I submit that this Affidavit supports probable cause for a search warrant authorizing the examination of the Facebook accounts described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Special Agent Brandon Dennis
Drug Enforcement Administration
Bismarck POD

Subscribed and Sworn to before me
on February 25, 2019: *by Telephone Conference.*

UNITED STATES MAGISTRATE JUDGE
Charles S. Miller Jr.
United States Magistrate Judge
District of North Dakota